**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GRANT G'SELL, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**MICHAEL CARVEN, et al.,**<br><br>**Defendants.** | **Civil Action No. 09-2309 (JDB)** |

## MEMORANDUM OPINION

Grant G'Sell, Jordyn G'Sell, and Kristen Hulse allege that while staying at a Washington, D.C. apartment building in June 2009, three men -- Michael Carven, Bryan Meuse, and Richard McNeil ("individual defendants") -- violently attacked them without provocation. They have brought common law and constitutional claims against these individuals, two of whom they allege to be law enforcement agents. They have also sued the apartment building's owner, the building's management company, and the management company's parent corporation ("building defendants") under a premises liability negligence theory.[1] Currently before the Court is Bryan Meuse's motion to dismiss in part, as well as the building defendants' motion to dismiss. For the reasons detailed below, the Court will grant in part and deny in part Meuse's motion, and will grant the building defendants' motion.

[1] They have also sued a building security officer, named as a "John Doe" defendant. Plaintiffs have not yet completed service of process against the security officer, or against McNeil. See Pls.' Opp'n to Mots. to Dismiss ("Pls.' Opp'n") [Docket Entry 30], at 2 n.4 & 3 n.5.

## BACKGROUND[1]

On June 25, 2009, plaintiffs were staying with Jane Maynard, the G'Sells' mother, at The Jefferson at Capitol Yards, an apartment building in Washington, D.C. Compl. ¶ 25. That evening, plaintiffs saw the individual defendants in the public common area of the apartment building. Compl. ¶ 26. According to them, "Officer Carven was naked, lying on the floor in the entrance of the elevator; Deputy Meuse was straddling Officer Carven engaging in simulated anal intercourse." Compl. ¶ 27.[2] Plaintiffs contend that the building's video surveillance system captured this event, but that the building's security officer took no action. Compl. ¶¶ 28-29.

Some hours later, plaintiffs encountered the individual defendants in a common hallway in the apartment building. Compl. ¶ 30. Plaintiffs assert that Carven approached Jordyn G'Sell in a sexually aggressive manner and tried to embrace her; she attempted to retreat. Compl. ¶¶ 31-32. Carven shouted and swore at Jordyn, calling her a "lesbian" and a "dyke," and "raised his fists as if to . . . punch her." Compl. ¶¶ 33-34. Carven instead hit Hulse in the face, drawing blood. Compl. ¶ 35.

Plaintiffs fled to the elevator, but after they got in Meuse blocked the doorway and prevented the elevator doors from closing. Compl. ¶¶ 36-37. Meuse then entered the elevator, took Grant G'Sell by the neck, and held him off the floor against the elevator wall. Compl. ¶ 38. Jordyn begged Meuse to release her brother, but Meuse refused, and Carven again tried to hit Jordyn. Compl. ¶¶ 39-40. Plaintiffs threatened to call the police, but Carven and Meuse laughed

---

[1] The factual background is drawn entirely from plaintiffs' complaint.

[2] Plaintiffs allege that, at the time in question, Carven was a U.S. Secret Service Officer and Meuse was a Middlesex County (Massachusetts) Sheriff's Deputy. Compl. ¶¶ 4-5.

and told them it would do no good because "they were the police." Compl. ¶ 41.

Meuse released Grant, but he again blocked the elevator doors. Compl. ¶ 42. He took Grant by the neck once more and again held him against the elevator wall. Compl. ¶ 43. After about 10 minutes, Carven and Meuse allowed the elevator doors to close. Compl. ¶ 44.

Plaintiffs sued Carven, Meuse, and McNeil, alleging assault, sexual assault, battery, intentional infliction of emotional distress ("IIED"), unlawful imprisonment, and liability under 42 U.S.C. § 1983. They also sued security officer Doe; 70 Eye Street L.L.C., the building's owner; and JPI Management Services, L.P., the building's management company.[3] Against these latter entities they have alleged a negligence claim for premises liability. The building defendants have moved to dismiss the premises liability claim, and Meuse has moved to dismiss the IIED, unlawful imprisonment, and § 1983 claims against him.

## STANDARD OF REVIEW

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S.

[3] JPI Management Services is a subsidiary of Greystar Real Estate Partners, LLC, another defendant.

at 555-56.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible in its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); accord Atherton v. Dist. of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).  A claim to relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949.  This amounts to a "two-pronged approach," under which a court first identifies the factual allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 1950-51.

  The notice pleading rules are not meant to impose a great burden on a plaintiff.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002).  When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor.  See Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  The plaintiff must be given every favorable inference that may be drawn from the allegations of fact.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor does the court accept "a legal conclusion couched as a factual allegation," or "naked assertions devoid of further factual enhancement." Iqbal, 129 S.Ct. at 1949-50 (internal quotation marks omitted); see

also Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 n.4 (D.C. Cir. 2008) (the D.C. Circuit has "never accepted legal conclusions cast in the form of factual allegations" (internal quotation marks omitted)).

## DISCUSSION

### I. Building Defendants' Motion to Dismiss

"As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person." Kline v. 1500 Mass. Ave. Apartment Corp., 439 F.2d 477, 481 (D.C. Cir. 1970). Nonetheless, "[t]he law imposes a special duty upon the landlord to protect his tenant from foreseeable criminal acts of third parties." Morton v. Kirkland, 558 A.2d 693, 694 (D.C. 1989); see also Graham v. M & J Corp., 424 A.2d 103, 104 (D.C. 1980) (landlord's duty to keep common areas safe "has been extended to encompass situations where third party criminal acts injure tenants on the premises, when the criminal activity should have been foreseen by the landlord" (internal citations omitted)). Here, plaintiffs allege that the building defendants breached their "duty to take such precaution as were [sic] reasonably necessary to protect [their] tenants and their guests[] from criminal attacks in the building." Compl. ¶ 90.

"'[F]oreseeability is the key element in establishing the landlord's duty.'" Doe v. Dominion Bank, N.A., 963 F.2d 1552, 1560 (D.C. Cir. 1992) (quoting Graham, 424 A.2d at 105). In actions brought against a landlord for criminal acts committed by a third party, "liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent." Bd. of Trs. of Univ. of Dist. of Columbia v. DiSalvo, 974 A.2d 868, 870 (D.C. 2009) (quoting Potts v. Dist. of Columbia, 697 A.2d 1249, 1252 (D.C. 1997)). Such

heightened foreseeability "does not require previous occurrences of the particular type of harm, but can be met instead by a combination of factors" -- the totality of the circumstances, in other words -- "which give defendants an increased awareness of the danger of a particular criminal act." Dist. of Columbia v. Doe, 524 A.2d 30, 33 (D.C. 1987). "It is not sufficient," however, "to establish a general possibility that the crime would occur, because . . . the mere possibility of crime is easily envisioned and heightened foreseeability requires more precision." DiSalvo, 974 A.2d at 872-73.

Plaintiffs contend that because the building's security officer saw -- or should have seen -- the individual defendants simulating anal intercourse in a common area earlier that evening, their subsequent violent attack was foreseeable. See Pls.' Opp'n at 11. According to plaintiffs, the earlier incident put the building defendants "on notice that the two men were capable of outrageous, repugnant, and criminal conduct." Id. Such generalized notice, however, is insufficient: to show foreseeability, the evidence must demonstrate "that the defendant had reason to anticipate the type of particular criminal attack that actually occurred." DiSalvo, 974 A.2d at 873 (emphasis added). Here, though, the individual defendants' indecent conduct gave the building defendants no reason to anticipate that they would later assault plaintiffs. To be sure, the individual defendants were engaged in obnoxious behavior, but they were not being violent or harassing third parties. Nor was there an indication that they were intruders or otherwise not permitted in the building. Simply put, plaintiffs cannot draw a causal line from the earlier incident to the events later that night. Even in light of the individual defendants' prior conduct, the building defendants could not "know in advance of the particular attack in

question."[4] Ellis v. Safeway Stores, Inc., 410 A.2d 1381, 1382 (D.C. 1979); cf. Dominion Bank of Wash., 963 F.2d at 1561 (vacant floors, crime and sex in the building, aggressive intruders, and warnings about safety from tenants to landlord made rape foreseeable); Doe, 524 A.2d at 33-34 (arson, robbery, and sexual assaults, the presence of male adults roaming freely, and deficient security sufficient to render abduction and rape at a school foreseeable).[5]

Plaintiffs further argue that the building defendants' "security surveillance video system, their staffing a security desk to monitor that system, and their explicit publication of rules to govern conduct in the common areas demonstrate that not only was such conduct foreseeable, it was, at least as a class of possible danger, foreseen long before this incident." Pls.' Opp'n at 11. But these security measures demonstrate, at most, a broad concern for tenants' safety, and are not enough to meet the heightened foreseeability requirements applicable here. See DiSalvo, 974 A.2d at 872-73 ("It is not sufficient to establish a general possibility that the crime would occur . . . ."). Accordingly, the Court will grant the building defendants' motion to dismiss.[6]

---

[4] That the simulated intercourse may have violated District of Columbia laws prohibiting indecent or lewd conduct, see D.C. Code §§ 22-1312, -2201, does not alter this conclusion. Even assuming the individual defendants violated these laws, their non-violent behavior did not make it foreseeable that they would violently attack plaintiffs.

[5] Plaintiffs also contend that, "[e]ven assuming that the earlier [indecent] incident did not, itself, rise to the level which meets the 'heightened level of foreseeability' demanded under D.C. law, the later incident, as it progressed, certainly met that standard." Pls.' Opp'n at 11-12. But plaintiffs offer no authority for their suggestion that a criminal event can provide a landlord with notice of itself, even if the event spans a long time.

[6] The Court need not reach the question whether the building defendants' duty to protect against third-party criminal acts extends to non-tenants. See Building Defs.' Mot. to Dismiss [Docket Entry 15], at 9-10. Nor need it address whether Greystar Real Estate Partners and JPI Management Services are, in fact, landlords as to whom such a duty applies. See Building Defs.' Reply in Supp. of Mot. to Dismiss [Docket Entry 32], at 4-5.

## II. Meuse's Motion to Dismiss

Meuse seeks to dismiss plaintiffs' claims against him for IIED, unlawful imprisonment, and § 1983 liability. The Court takes each in turn.

### A. IIED

To assert a claim for IIED, a plaintiff must show "'(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" Minch v. Dist. of Columbia, 952 A.2d 929, 940 (D.C. 2008) (quoting Dist. of Columbia v. Thompson, 570 A.2d 277, 289-90 (D.C. 1990)). "The concept of 'outrageousness' is central to the tort," and "[l]iability will not be imposed for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998) (citations omitted). Rather, "[l]iability will be imposed only for conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Drejza v. Vaccaro, 650 A.2d 1308, 1312 n.10 (D.C. 1994)).

Plaintiffs contend that watching the individual defendants' simulated anal intercourse meets this standard. See Compl. ¶ 70.[7] The Court disagrees. "[T]he requirement of outrageousness is not an easy one to meet." Drejza, 640 A.2d at 1312. "'Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughness of the mental hide is a better protection than the law could ever be.'" Homan, 711 A.2d at 818 (quoting W. Page Keeton, Prosser & Keeton on Torts § 12, at 56 (5th ed. 1984)). What plaintiffs witnessed may have been inappropriate, indecent, and, given

[7] Plaintiffs do not argue that the alleged assault constitutes IIED. See Compl. ¶¶ 69-72.

that one participant was naked, even obscene. But the incident was, at base, merely juvenile behavior that was not directed at plaintiffs, and that plaintiffs were not obliged to watch. Obnoxious though it may have been, the simulated sex act was not "so extreme in degree[] as to go beyond all possible bounds of decency." See id.[9]

Moreover, in order to sustain a claim for IIED, a plaintiff must establish that he suffered "severe emotional distress." Minch, 952 A.2d at 940. To meet this standard, "the defendant's actions must proximately cause the plaintiff emotional distress 'of so acute a nature that harmful physical consequences might be not unlikely to result.'" Kotsch v. Dist. of Columbia, 924 A.2d 1040, 1046 (D.C. 2009) (quoting Clark v. Assoc. Retail Credit Men of Wash., D.C., 105 F.2d 62, 65 (D.C. Cir. 1939)).[10] Mere "mental anguish" or "stress" is insufficient. Futrell, 816 A.2d at 808; see also Kitt v. Capital Concerts, 742 A.2d 856, 861-62 (D.C. 1999) ("angst, sleeplessness, and humiliation" is not "greater [discomfort] than a reasonable person could be expected to tolerate"). Here, plaintiffs have alleged only that they "suffered, and will continue to suffer, great fear, emotional trauma and humiliation." Compl. ¶ 72. Such allegations are no more than "mental anguish" and thus cannot sustain a claim for IIED.

---

[9] Again, that the individual defendants may have violated District of Columbia laws prohibiting indecent conduct, see D.C. Code §§ 22-1312, -2201, does not alter this conclusion. Simply because behavior is lewd or indecent does not necessarily render it "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." See Homan, 711 A.2d at 818.

[10] Plaintiffs insist that they need to allege only the individual defendants' "'intent to purposely cause a disturbance of plaintiff's mental or emotional tranquility of so acute a nature that harmful physical consequences might be not unlikely to result.'" Pls.' Opp'n at 13 (quoting Waldon v. Covington, 415 A.2d 1070, 1076 (D.C. 1980)) (emphasis added). Not so. Although IIED requires intent to cause emotional distress, it also requires that "the defendant's actions must proximately cause the plaintiff emotional distress." Kotsch, 924 A.2d at 1046.

B. Unlawful Imprisonment

Meuse also seeks to dismiss plaintiffs' claim that he unlawfully imprisoned them by blocking the elevator doors during the alleged assault. An unlawful imprisonment claim requires "[a]n unlawful deprivation of freedom of locomotion for any amount of time, by actual force or a threat of force." Marshall v. Dist. of Columbia, 391 A.2d 1374, 1380 (D.C. 1978). "Intent is required," and "in order to be actionable, the intended actions or words of the defendant must at least furnish a basis for a reasonable apprehension of present confinement." Id. "Submission to the mere verbal direction of another, unaccompanied by force or threats of any character does not constitute false imprisonment." Faniel v. Chesapeake and Potomac Tel. Co. of Md., 404 A.2d 147, 152 (D.C. 1979).

Plaintiffs easily satisfy this standard. They allege that Meuse twice prevented the elevator doors from closing, thus trapping them inside. Compl. ¶¶ 37, 42. And Meuse's actions took place in the midst of an allegedly violent assault, which amply indicates that plaintiffs were reasonably apprehensive of present confinement.

Meuse contends that holding elevator doors open "occurs everyday in office buildings," and therefore cannot support a claim for false imprisonment. See Meuse's Mot. to Dismiss ("Meuse's Mot.") [Docket Entry 25], at 8-9. This argument is frivolous. Under normal circumstances, holding elevator doors open does not create a reasonable apprehension of confinement. Quite the opposite in the context alleged here, where plaintiffs were trying to use the elevator to flee an attack.[11]

---

[11] Meuse states that a video of the assault contradicts plaintiffs' factual allegations. See Meuse's Reply in Supp. of Mot. to Dismiss ("Meuse's Reply") [Docket Entry 31], at 1 & 9 n.2.
(continued...)

C. § 1983 Claim

Finally, Meuse seeks to dismiss plaintiffs' § 1983 claim for damages. Claims brought under § 1983 require the "violation of a right secured by the Constitution and laws of the United States" by "a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).[12] Officers acting solely "in the ambit of their personal pursuits" are not acting under color of state law. Screws v. United States, 325 U.S. 91, 111 (1945).

"[W]hile it is clear that 'personal pursuits' of police officers do not give rise to section 1983 liability, there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." Pitchell v. Callan, 13 F.3d 545, 548 (2d Cir. 1994). Rather, "whether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995). The test is objective. Pitchell, 13 F.3d at 548-49. "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." Martinez, 54 F.3d at 986. Thus, "[a]cts committed by a police officer even while on duty and in uniform are not under color of state law unless they are in some way related to the performance of police duties."

[11](...continued)
But the video is not before the Court, and in any event it would be improper to assess the validity of plaintiffs' factual allegations on a motion to dismiss. See Iqbal, 129 S. Ct. at 1950 (courts must assume the veracity of well-pled factual allegations). For this reason, the Court also cannot credit Meuse's assertion that it would be physically impossible for him to "block the elevator entrance and hold someone against a wall inside the elevator at the same time," as he believes plaintiffs have alleged. Meuse's Reply at 9-10.

[12] Meuse suggests that plaintiffs have failed to plead sufficient facts to show that he violated plaintiffs' constitutional rights. See Meuse's Mot. at 5. He provides no support for this assertion, however.

Gibson v. City of Chicago, 910 F.2d 1510, 1516 (7th Cir. 1990) (internal quotation marks omitted); see also Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 449 (1st Cir. 1997) (an officer does not act under color of law "if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties"). And "liability may be found where a police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department." Pitchell, 13 F.3d at 548.

"[O]ff-duty police officers who purport to exercise official authority will generally be found to have acted under color of state law." Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994); see also Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003) ("We have no doubt that when an [off-duty] officer identifies himself as a police officer and uses his service pistol, he acts under color of law."); Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989) (that officer was "off duty, out of uniform and driving his own vehicle" is "not dispositive"). But simply because an individual is known to be a police officer "does not alone transform private acts into acts under color of state law." Van Ort v. Estate of Stanewich, 92 F.3d 831, 839 (9th Cir. 1996).

Here, Meuse contends that he was not acting under color of state law because his actions throughout the evening in question were his own private pursuits wholly unrelated to any police activities or obligations.[13] Plaintiffs, for their part, contend that the individual defendants'

---

[13] As a threshold matter, Meuse insists that he "was merely employed as a jail guard with the Middlesex County Sheriff's Department," and thus lacked the power to seize or arrest plaintiffs. Meuse's Mot. at 6. Therefore, according to him, he cannot be liable under § 1983 because he had no actual authority to seize or detain plaintiffs. Id. (citing Gibson, 910 F.2d at 1518) ("[O]ne cannot misuse power that one [does not] possess.")). Plaintiffs, however, have alleged that Meuse is a deputy sheriff, Compl. ¶5, and therefore the Court must accept for

(continued...)

actions, "together with Meuse and Carven's joint communication of law enforcement status in the face of threats to call the police[,] support the logical inference that they were acting under 'color of state law.'"  Pl.'s Opp'n at 15.

This is a close case.  To determine whether an officer is acting under color of state law, a court must examine the officer's "conduct in light of the totality of surrounding circumstances."  Martinez, 54 F.3d at 987.  Here, plaintiffs first encountered Meuse while he was engaged in a lewd incident having nothing to do with any police business.  And when plaintiffs saw Meuse later that evening, he did not identify himself as a police officer.  Nor did anything about him suggest that he was a law enforcement agent -- he was not wearing a badge or uniform, or holding a weapon.  Indeed, by the time Meuse identified himself as a police officer, the assault, as plaintiffs describe it, was well-underway.  Carven had already approached Jordyn G'Sell in a sexually aggressive manner and tried to embrace her, Compl. ¶ 31, and had sworn at Jordyn and hit Hulse in the face.  Compl. ¶¶ 33-35.  Meuse, for his part, had blocked plaintiffs inside the elevator and was holding Grant G'Sell by the neck against the elevator wall.  Compl. ¶¶ 37-38.  Further, Meuse did not attempt to arrest plaintiffs or suggest that they were breaking the law.  Nor did he make any other show of police authority, such as by using handcuffs or brandishing a service weapon.  See Jocks, 316 F.3d at 134 ("We have no doubt that when an [off-duty] officer identifies himself as a police officer and uses his service pistol, he acts under color of law.").

Moreover, "[m]ere statements by individuals that they are entitled to a special privilege because of their official status do not constitute action under color or pretense of state law if the

---

[13](...continued)
purposes of this motion that Meuse did in fact have law enforcement authority at the time of the assault.  See Iqbal, 129 S. Ct. at 1950.

asserted privilege lies clearly outside the scope of their official duties." Parrilla-Burgos, 108 F.3d at 450. Thus, in Parilla-Burgos, the First Circuit held that an officer's statements that he could "look dirty" at another person because he was a police officer "so clearly fell outside his official capacity that they did not constitute a reasonable pretense that he was acting as a police officer at the time." Id. Meuse's statement that he was the police -- isolated and made in the middle of a violent confrontation -- is arguably no different.

Nonetheless, the Court will not grant Meuse's motion to dismiss, which is made before any discovery into the facts has occurred. Specifically, the Court cannot yet evaluate Meuse's "conduct in light of the totality of surrounding circumstances." See Martinez, 54 F.3d at 987. The complaint alleges that, after plaintiffs threatened to call the police, Meuse and Carven "told them it would do no good because 'they were the Police.'" Compl. ¶ 41. But the complaint does not reveal plaintiffs' version of the entirety of Meuse's statement -- namely, the portion of Meuse's statement where he told them it would do no good to call the police. Nor, obviously, is Meuse's version of the events yet before the Court.

As noted above, "off-duty police officers who purport to exercise official authority will generally be found to have acted under color of state law." Barna, 42 F.3d at 816. And "[m]anifestations of such pretended authority may include . . . identifying oneself as a police officer." Id. Moreover, "liability may be found where a police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department." Pitchell, 13 F.3d at 548. According to plaintiffs, Meuse did just that: by saying that calling the police would do no good because he was the law, Meuse used his authority as a police officer to intimidate plaintiffs and to prevent them from seeking help. In fact, by telling plaintiffs that calling the police would

be futile, if that in fact happened, Meuse arguably suggested to them that other officers would sanction his behavior, and indeed that his actions were lawful because of his authority as a police officer.

But without knowing more about the event and its surrounding circumstances, including just what Meuse said, the Court cannot determine the extent to which he "invoke[d] the real or apparent power of the police department," see Pitchell, 13 F.3d at 548, or whether, as Meuse argues, his behavior "so clearly fell outside his official capacity that [it] did not constitute a reasonable pretense that he was acting as a police officer at the time," see Parrilla-Burgos, 108 F.3d at 450. Because plaintiffs allege that Meuse identified himself as a police officer, and used his authority as a police officer to intimidate them and to further the assault, however, it is "plausible," Iqbal, 129 S. Ct. at 1949, that Meuse's actions "related in some meaningful way either to [his] governmental status or to the performance of his duties," see Parrilla-Burgos, 108 F.3d at 449. Accordingly, the Court will deny Meuse's motion to dismiss plaintiffs' claim for § 1983 liability at this time to allow discovery into the relevant facts and, perhaps, a fuller record for subsequent reconsideration of this admittedly close question.[14]

**CONCLUSION**

For the reasons stated above, the Court will grant the building defendants' motion to dismiss, and will grant Meuse's motion to dismiss as to the plaintiffs' IIED claim. The Court will

[14] In denying Meuse's motion to dismiss, the Court is not ruling on whether plaintiffs' allegations, if proven, would be sufficient to establish that Meuse was acting under color of state law during the assault. Rather, accepting all "reasonable inference[s]" in plaintiffs' favor, and with the totality of surrounding circumstances yet to be revealed, the Court merely concludes that plaintiffs have "state[d] a claim to relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949 (internal quotation marks omitted).

deny Meuse's motion to dismiss plaintiffs' unlawful imprisonment claim and the claim under § 1983. A separate Order accompanies this Memorandum Opinion.

                                                                                    /s/ John D. Bates
                                                                                    JOHN D. BATES
                                                                    United States District Judge

Date: July 21, 2010